Case No. 1735A, Connie McGirr, et al. v. Thomas Rehme, et al. Argument not to exceed 15 minutes per side. Mr. Rehme, you may also be seated. Good morning. Don Rafferty for the appellants. Your Honor, if I may reserve two minutes for rebuttal. This is an appeal from the district court's grant of a preliminary injunction that effectively freezes all of the assets of Waite, Schneider, Bayless, and Chesley. Which is owned exclusively by Chesley. Your Honor, the shares are owned by Thomas Rehme pursuant to the... Well, that's subsequent, though, to all of this tomfoolery that's gone. No. I thought the facts showed Chesley was the sole shareholder when all of this was going down. No, let me, for the benefit of the court, go back in time and trace the history. Mr. Chesley was the sole shareholder of the firm for many, many years until April 15 of 2013. At which point he had made the decision, and there was testimony in the preliminary injunction hearing, to surrender his Ohio license. In order to allow the firm to continue to have the right to collect fees on then existing but unresolved pieces of litigation. Mr. Chesley had to transfer ownership of those shares to someone else. He could not, as a disbarred lawyer or a non-practicing lawyer, continue to own the shares. That, you've read in the papers, led to the drafting and preparation of a thing that was called the wind-up agreement. Under the wind-up agreement, the ownership of the shares were transferred to Tom Ramey. Mr. Chesley retained for himself a contingent economic interest in the shares so that the net, effectively, the net income from the firm after payment of creditors and other things would inure to his benefit. When that occurred, litigation was pending, underlying litigation in Kentucky, but was not yet concluded. There was no judgment against Mr. Chesley. Does that answer your question? Not really. You know it doesn't, but that's hard. Okay. So the injunction freezes the assets of the firm, precludes Wade Schneider, Mr. Ramey, or anyone from Who holds the assets? As we sit here today? Well, no. I know who does today, the district court, but who holds when he assigns all of his shares to Mr. Ramey? Does Mr. Ramey then theoretically have complete control over this scheme? He has control over the company that has the assets, the fees generated by the lawsuits and the like. But those were always in flux, were they not, as to what was owed, who was owed, and so forth? When you say those, I'm sorry. The fees. So let's go back and talk about the fees. When the shares were transferred to Tom Ramey under the wind-up agreement, the largest single case that was then outstanding at Wade Schneider, and there was testimony, substantial testimony in the record about that, was a Fannie Mae class action case. It was not yet settled. It was projected at that time to be potentially a billion-dollar case. Bill Markovitz, who succeeded Mr. Chesley in terms of lead counsel, described that. The preservation of the firm's ability to collect that fee was the largest significant motivator to setting up the wind-up agreement as it was set up. That fee ultimately came in at a substantially lower number than was anticipated. I don't remember the precise number. It was approximately $16 million. There was also a fee in a case called the Rocky Flats litigation. That's a lawsuit that had been pending for 29, 28 years in Colorado. There were other pending matters that were outstanding and unknowable or unknown at that time. Why wasn't this arrangement that you described where Mr. Chesley surrenders his bar license, this new entity gets the fees, and then you said it nets out so that the fees ultimately inure to Mr. Chesley's benefit. Why isn't that just a patent circumvention of whatever rule required him to surrender his bar license? Because, Your Honor, I don't believe the law in Ohio that it's a circumvention. We had Mr. Alvin Matthews and Marion Little. Marion Little was the attorney who represented Mr. Chesley before the Ohio Supreme Court, negotiated the arrangement with the Ohio Supreme Court for the retirement of his license, and developed the wind-up agreement. Then Alvin Matthews also testified who is an Ohio attorney that specializes in these sorts of arrangements. Okay, so I guess sort of that's a quirk in Ohio law that you can do it that way, I guess. I think so. I mean, so the Ohio Supreme Court broomed this probate matter, is that correct? The Ohio Supreme Court ordered that it basically ordered that it be. So, I mean, it would just seem as a matter of plain common sense that we should not be saying the district court abused its discretion for any reason based on a probate matter that's no longer pending. I mean, is that fair or what am I missing? Well, I think the problem with it is this. The plaintiffs in this case made a number of accusations from the beginning. There was a preliminary injunction hearing that was held that was specifically targeted to claims of fraudulent transfer. Right. And those claims, the presentation of the plaintiffs involved a PowerPoint presentation where counsel described things in the PowerPoint, reference to two depositions that were brief, and little more. There was substantial evidence presented, substantial testimony that is not disputed regarding, for example, the propriety under Ohio law of the wind-up agreement arrangement. The fact that Mr. Chesley, by retaining the economic interest, couldn't have fraudulently transferred anything because he kept the same, he had the same net economic benefit. He, in fact, enhanced the value of the firm by preserving its ability to continue to collect those future fees. It seems like what was going on was that these transactions or whatever you want to call them, yes, they're preserving Mr. Chesley's economic benefit, but it would seem like it's also making it increasingly difficult or continually thwarting the ability of his creditors to be able to obtain that same economic benefit. Am I misunderstanding the purpose or effect of all this? I think that is a misunderstanding. I don't think anything about the wind-up agreement changed the rights of any creditor to obtain whatever Mr. Chesley's economic interest is in the firm. Why the constant sort of metamorphoses of the firm here? There was, well, so there were two metamorphoses, if you will. It looks like, respectfully, it's kind of just staying one step ahead. Okay. That's a fair question, and I'd like to address it. The first of two, I'll call them metamorphoses. Metamorphosis number one would be the wind-up agreement that we talked about earlier, which was crafted in 2013 in order to preserve the firm's right to collect. The second was when Tom Ramey transferred the shares to Thomas Ramey Trustee, Inc. That's number two. We put in the record the affidavit, maybe it was a declaration of Mr. Ramey, that explains clearly what the purpose of that was. First of all, that did not in any way alter any plaintiff's ability to attach any asset of Mr. Chesley or in any way diminish that asset. The sole purpose of transferring the shares to Ramey, Inc. was to allow Waite, Schneider, Bayless, and Chesley, which had always been taxed as an S corporation pass-through, to be treated as a C corporation. Because when the decision was made to file the ABC, because frankly at that point, the two choices in our judgment for an orderly liquidation and to sort of stop the madness were to file bankruptcy or to file an ABC. The ABC was selected, frankly, because it was my judgment. I thought it was the quickest, easiest, most efficient way to resolve these things. ABC? The ABC, Assignment for the Benefit of Creditors. I'm sorry. Oh, right. So when that ABC was going to be filed, we knew for sure Mr. Chesley would not get another penny from that firm. And so I couldn't allow tax liability to flow through to him where the assets were. I understand. I guess the difference potentially between those two approaches is bankruptcy proceeding, the trustee has the ability to clause some things back. It's not just what the debtor chooses to assign. There are things like, you know, there are all kinds of ways, you know, 547, 551, et cetera. If I recall, my bankruptcy claims. There are other provisions. The Assinee would similarly have the ability to pursue claims if there were claims to recover. But frankly, the ABC, what became very clear to us is the plaintiffs and everyone were frustrated with Mr. Ramey's role in this. They did not, there was the perception that Mr. Chesley was directing things. There's evidence to support that. I'm sorry? There's evidence to support that, including his signing various things at various times, including his direction to Mr. Ramey. I mean, there's plenty of evidence to support that. Your Honor, Mr. Chesley signed six or seven checks. He signed a resolution in a stack of bank documents that was described when all of the other documents were signed by Mr. Ramey. The testimony of both Mr. Ramey and Mr. Horner, the direct testimony, the depositions they put in, were that Mr. Ramey made the decisions, the final decisions with respect to those matters. Mr. Ramey testified that he didn't recall taking any step that Mr. Chesley didn't want him to take. No. For example, and I remember, well, there are two very, very significant steps that were taken and are in the record that were vehemently opposed by Mr. Chesley. And one was the payment of all of the money to resolve the Wade-Schneider pension plan, which was, there were two separate payments of $2.4, $2.5 million. I'm sorry, my time is up. I don't know if you, I presume you reserved time for rebuttal, but I didn't write it down. I did, two minutes. You got it. Well, I'm not going to give it to her, Chair. Thanks, appreciate your answer. Good morning. May I please support Angela Ford for the appellees? Where to start? I believe I'll start by trying to answer your question about the beginning. You certainly may. Can you keep your voice up? Yes, I'll try. Thank you. I'll start by trying to answer your question on the beginning of the transfers of the Wade-Schneider ownership. In the Kentucky court action, of course, the wind-up agreement, the transfer of Mr. Chesley's shares to Thomas Ramey was the beginning of that. And under that agreement, it actually looked like a legitimate document in the beginning. Under that agreement, Mr. Chesley would transfer his ownership interest in trust, and then when the firm was wound up, anything left would inure to his beneficial interest after any creditors would pay. Now, what the trial court found in Kentucky is that that particular agreement was a sham agreement, that Chesley, in fact, continued to control the law firm in nearly every way. Rather than wait for any beneficial interest after creditors were paid and the firm was wound up, he continued to take millions of dollars out of the firm as fee income came into the firm. And he continued to make the decision, sign, I think in our brief we mentioned signed, or actually the trial court's order went over some of the evidence about him signing checks, signing bank documents, and that sort of thing. So that was the beginning. Now, moving on, that agreement is found to be a sham, and so we then executed on Mr. Chesley's ownership interest in the firm since the trial court essentially set aside the wind-up agreement. So we had an execution order like any judgment creditor would have. We executed on personal property of Mr. Chesley because he was the sole owner of the firm, the president of the firm. There were no partners. He had no partners, never had any partners as part of his law firm. So we executed on that, and then that was the beginning of the tangled web that is reflected in the Ohio Supreme Court's opinion on the activity in Ohio that led them to issue the second writ against Judge Winkler in that case that is specifically on the probate action. So fast-forwarding then to what happened to the law firm after that brings us to the probate action. Here we are, five, maybe six weeks after the preliminary injunction hearing that lasted over a two-day period of time. There's the creation of a new entity, Trustee Inc., and then two days later, there's a transfer of Olive Waite Schneider by Mr. Ramey to Trustee Inc., and then the same day, Trustee Inc. resolves to transfer, I'm sorry, resolves to file the ABC case. And then eight days later, the assets are transferred. This is after the district court Judge Cleland held a two-day hearing? That's after. So within five weeks, I believe, of that hearing being concluded, all these transfers begin. It must have been an interesting morning in Judge Cleland's courtroom the first time. Well, it was brazen, and that's what we argued. And, of course, we didn't find out about it immediately because they didn't advise the court. In fact, they were responding to a motion and never disclosed to the court what they had done, but it did come out. And that was the reason why we ultimately filed a motion for a TRO on that transfer. So are the assets now held by Trustee Inc. because of the events you've just described? Well, Trustee Inc. received Olive Waite Schneider and then deeded the assets, transferred the assets to the assignee, Mr. Geary. Now the probate action has been dismissed, and so as far as irreparable harm, there is no irreparable harm or fear of harm that the assignee is going to liquidate and distribute assets to creditors. So that goes away. The probate action is gone, but the dismissal of the probate action does not unwind the transfers. So that's why, in our view, the dismissal of the probate action has no effect whatsoever on the continuation or on Judge Cleland's findings on our likelihood of success on his finding that we were likely to succeed in avoiding the transfer. Are you saying you're not sure who has the assets right now, but you just want them to stop moving? Well, no. And this gets to the point about why the dismissal of the ABC case has no effect on this action, because Mr. Geary still holds the assets. Trustee Inc. still holds the ownership interest. So no action for the assignee to proceed in, but he is still left with the assets. Now, Mr. Geary has said, well, the case has been dismissed, and he signed an agreed order to transfer the assets to a receiver appointed by Judge Cleland. He's also offered to transfer the assets back to Trustee Inc. And, of course, it is that potential transfer back to Trustee Inc. that will cause irreparable harm to the plaintiffs. Why? Well, Trustee Inc. is owned by Mr. Ramey. Mr. Ramey has a history now of being involved in three transfers involving Wade Schneider assets. So based on that pattern of conduct, there is not just a strong probability, I would argue, but it is beyond any doubt that he would once again dissipate or fraudulently transfer the assets of Wade Schneider if this injunction is not affirmed. I guess just one contextual question. I mean, if a creditor, a substantial creditor, sees that the debtor is moving assets all over the place, and correct me if I'm wrong, but why wouldn't the creditor just force that debtor involuntarily into federal bankruptcy and then start just unwinding these transfers as fraudulent, fraudulent transfers? I'm not a bankruptcy lawyer, but I can tell you where it started. It started with a very simple execution order. Transfer your interest to us to satisfy the judgment. That was the easiest, cleanest, most expeditious, and least expensive way to proceed. So that was reasonable. But what happened after we got that execution order is when the real trouble started in Ohio. We were finished in Kentucky, thought the case was over, but what happens instead is the lawsuits began in state court. First I get sued and some of my clients get sued to prevent us from domesticating the judgment in Ohio or taking any action to collect the judgment or even conducting any discovery. That's the first Supreme Court opinion in Ohio that is referenced in the Judge Winkler opinion. That's the writ filed against Judge Ruhlman that was decided a year before the writ against Judge Winkler was filed. I guess you're content with the preliminary injunction. You think it, I mean, you're defending it, so I mean it protects your interest. Absolutely. I'm just curious. Does it bring an end to all this moving around stuff? Yes, and that's what we have asked for. Now, after the preliminary injunction hearing is part of that, we asked for a receiver to be appointed because of all of the cascade of events that could happen. Given that Mr. Goering, the assinee, was handpicked by White Schneider, and because of his position in the probate action that we were not creditors. We really didn't have any rights to recover anything. And so, of course, Judge Cleveland wound up finding, well, based on that position, it's easy to see where the irreparable harm is pre-dismissal of the probate case to the plaintiffs because they're not going to recover anything. These other creditors that neither the CFO or the president of White Schneider knew about, they testify they knew nothing about any debt. And yet, nevertheless, this probate action is filed, which is supposed to be a bankruptcy-like proceeding. So because the assinee took the position that the plaintiffs were not creditors, that's where the irreparable harm is and continues to be if it's transferred back to the same person who has repeatedly transferred the interest in the past. Is the federal action over? I mean, are you done in terms of seeking relief there? Oh, no. This is, I wouldn't say, it's not near the end because we got the preliminary injunction. But now that action has been dismissed and we need a receiver in the case. We have needed a receiver for some time to hold the assets. Sorry, what action has been dismissed? The probate case. Right. State court. Right. Okay. So you anticipate you want to ask Judge Cleveland for more relief in the future? Absolutely. Absolutely. There are quite a few motions pending before Judge Cleveland now. One is the request to appoint a receiver that's been pending for some time. And I believe he has been awaiting this court's decision on this appeal of his injunction before moving forward with the case. So that's essential because assets are being, even though they're not supposed to be transferred, they're being dissipated because nobody's in charge of anything. Okay. You know, insurance for 29 cars and storage fees and tax claims that are rolling in because nobody's minding the ship. Meanwhile, my clients, you know, are suffering harm because assets are being dissipated because there's no receiver to try to wind anything up and deal with any claims from any third parties. It's my time. So if the panel has no other questions, I'll rely on my brief. Thank you. If I could just address a few points that were raised in the Apley's comments. Let me ask you just a fundamental question. What's the problem with Mr. Chesney? Why wouldn't he agree to having a receiver appointed on these funds? They can be distributed correctly. If he's got any monies owed later, the receiver can see to that. Everybody's protected. Your Honor, I don't think. Except you can't do any more tomfoolery, but at least everybody's protected. Well, I don't represent Mr. Chesney, so. But he seemingly, I would not think that he's not pulling an awful lot of strings. Well, I can tell you that he's decidedly not. You can tell me whatever you want. That's the beauty of the First Amendment. I'm not on his good list. I want to make a couple of points. We talked about the transfer of assets. I just want to be clear because this needs to be clear on the record. The assets have never been transferred anywhere. They stay in Waite, Schneider, Bayless, and Chesney. With the exception of the assignment to the ABC, to a public forum supervised by court, the assets have never moved. So you're talking about an entitlement is what's getting shifted around here? The plaintiffs have a judgment against Mr. Chesney. Their access to Mr. Chesney's assets has never changed through that process. We heard about a Kentucky. Zero to zero? No. Your Honor, there is a lot of generalized, I would say, misinformation out there. There is substantial money both. I'm just talking about access. I mean, they're complaining they've had zero access and that hasn't changed. That's well and true. They don't. As we sit here today, they don't have an execution order in Ohio. They've had a domesticated judgment for two years. They haven't done what they need to do. We heard about a Kentucky order, the execution order. That order is not, number one, valid or enforceable against Waite, Schneider. That's been concluded in Nevada. The interpretation they've offered was rejected in Colorado, and that's the case under Ohio law. More important. My time is out. I'm sorry. I saw you. I'll stop. That was intended to be a subtle statement. I apologize. Thank you. Thanks. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you. Case number 166368. Case number 166370. 166726.